## State of Vermont v. Timothy Miller

[502 A.2d 832]

No. 83-279

Present: **Hill, Underwood, Peck and Gibson, JJ., and Daley, J. (Ret.), Specially Assigned.**

Opinion Filed July 19, 1985

Motion for Reargument Denied September 13, 1985

*John J. Easton, Jr.*, Attorney General, *Elizabeth Grant Rome* and *Robert V. Simpson, Jr.*, Assistant Attorneys General, *David Tartter* and *Karen Corti*, Law Clerk (On the Brief), Montpelier, and *Susan L. Fowler*, Chittenden County Chief Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Andrew B. Crane*, Defender General, and *William A. Nelson*, Appellate Defender, Montpelier, for Defendant-Appellant.

**Gibson, J.** Defendant appeals his conviction and sentence on a charge of second degree murder. Defendant raises six issues on appeal: (1) the State failed to prove defendant intentionally participated in a common criminal plan unlawfully to kill another human being; (2) the court erred in declining to instruct the jury that prior inconsistent statements of witnesses could be considered as substantive evidence, and not merely as impeachment; (3) the State's failure to disclose in a timely way certain prospective testimony was prejudicial error; (4) the court erred in rejecting defendant's requested jury instructions on accomplice liability; (5) the court erred in excluding evidence that defendant's alleged accomplice had been acquitted, and in instructing the jury that defendant could be convicted as an accessory, despite the alleged accomplice's acquittal; and (6) assistant judge participation in sentencing was unconstitutional. We affirm.[1]

## I.

Defendant first claims the State failed to prove that he intentionally participated in a common plan to murder Timothy O'Neal. The question on appeal is "whether the evidence, when

---

[1] We do not reach the State's cross-appeal, challenging the court's suppression of statements given by defendant to the police.

viewed in the light most favorable to the State, is sufficient to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *State* v. *Derouchie*, 140 Vt. 437, 445, 440 A.2d 146, 150 (1981).

The evidence, taken in the light most favorable to the State, establishes the following. During the afternoon of April 8, 1982, the victim, Timothy O'Neal, cashed his paycheck and, possessing more than $200, began frequenting bars in the vicinity of the Champlain Mill, a shopping mall in Winooski. By evening, O'Neal was very drunk. Although not violent, he became a persistent nuisance at a bar called "Le Club." After several female patrons complained, Le Club's bartender expelled O'Neal, who returned twice more and was expelled each time.

Defendant and a companion, Richard Sorrell, were also patrons at Le Club. After O'Neal's third expulsion, Le Club's manager asked defendant and Sorrell, who were then standing outside, to take care of O'Neal and they agreed to do so. Soon thereafter, O'Neal entered Le Club again, to retrieve his coat. Defendant pursued him and pulled him outside before it could be found.

A service road ran between the Champlain Mill and Le Club, leading to a rear parking lot and service entrances. A cement abutment at the rear of the parking lot borders the Winooski River as it runs downstream to a waterfall. An irregular hole in the abutment permits access to the river bank.

Between 11:30 p.m. and midnight, shortly after defendant had pulled O'Neal out of Le Club, a witness saw defendant, O'Neal and Sorrell walking down the service road toward the river. Later, another witness saw two men walking together along the river bank, toward the falls, looking into the water.

Some time after midnight, defendant appeared at his sister's house, where he kept his clothes. When he arrived, defendant stamped his feet, as though his shoes were wet. Although testimony by the sister was sketchy and conflicting, the jury could reasonably have believed that defendant immediately shut the lights off. While there, he picked up pants, shirt and a pair of shoes, then left after about ten minutes. Two days later, he returned and vacuumed the floor of the house.

After leaving his sister's house with his change of clothing on the night of the crime, defendant next appeared at his girlfriend's apartment, noticeably favoring his shoulder. Asked by the occupants how he had gotten blood on the cuffs of his pants, defend-

ant replied that he had been in a fight and broken the other person's nose. Defendant later said he'd had a fight with a black man at the Mill Restaurant. At another time he said he had fought two black men there. The Mill Restaurant was closed that night.

After changing his clothes, defendant gave the clothes he had been wearing to his girlfriend and asked her to wash them thoroughly. He then returned with Sorrell to Le Club, where the manager thanked them for helping "take care of the problem" of O'Neal. When the manager asked what had happened to O'Neal, defendant replied, "We lost him" and then volunteered: "He's pretty much of a ding-a-ling—he was always threatening to commit suicide."

Defendant and Sorrell began purchasing mixed drinks with large bills, buying drinks for others and leaving large tips. Earlier in the evening, they had purchased beers with exact change, leaving no tips. On the following day, defendant's brother noticed that, although defendant had been broke the day before, he now had money.

The next morning, Timothy O'Neal was discovered dead in the Winooski River. A trail of smeared blood, drag- and scuff-marks, scrapes and bruises, a lost sneaker and tears in O'Neal's trousers established that he had been pulled through the hole in the abutment and dragged, head first, face down, for a distance of about 55 feet, then placed in the river. His body snagged on a rock in the rapids above the falls, having been carried 75 yards downstream from the hole in the abutment. He had passed along the part of the river where the two men had been seen walking. There was no money in his wallet, and he wore no outer coat.

The cause of O'Neal's death was "asphyxia due to drowning" sometime between midnight and 3:00 a.m. Forensic examination determined that, before O'Neal was placed in the water, someone's arm had been wrapped around his neck in a choke hold, and that he had suffered three or four blows on the head with a large rock. The rock was found nearby, with several of O'Neal's hairs on it. O'Neal's hands had sustained injuries, apparently while fending off the blows.

Police investigators questioned defendant. Describing his own activities on the night in question, defendant identified several bars that he had visited but did not mention the Mill Restaurant. Nor did he mention visits either to his sister's or girlfriend's homes. He told the police that after a black man, standing with

two other black men and a white woman in front of Le Club, warned him to leave O'Neal alone, he never saw O'Neal again.

After defendant's sister, girlfriend and other relatives were summoned to testify at an inquest, and after defendant learned of the inquest, he and Sorrell announced a trip to Canada and disappeared. Two months later, more than seven weeks after arrest warrants had issued, they surrendered in Florida, telling Florida police that they had been involved in a fight at Le Club.

As is apparent from the preceding summary, the State's case was built largely upon circumstantial evidence. Circumstantial evidence will sustain a conviction if it is sufficient to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt. *State* v. *Rollins*, 141 Vt. 105, 112-13, 444 A.2d 884, 888 (1982); *Derouchie, supra*, 140 Vt. at 445, 440 A.2d at 150. From the evidence of defendant's companionship with Sorrell, their presence at the scene with the victim shortly before the crime, the injuries to O'Neal, the rock containing O'Neal's hairs, the trail of blood, the blood on defendant's clothes, and defendant's actions before and after the crime, a reasonable jury could conclude that defendant participated in taking O'Neal to the river, where he assaulted, robbed, and then placed O'Neal in the river. The evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that defendant was guilty of participating in a common plan to murder Timothy O'Neal.

## II.

Defendant next claims the court erred in declining to instruct the jury that prior inconsistent statements by witnesses could be considered as substantive evidence, and not just for impeachment.

Before the jury retired, defendant approached the bench and objected to the court's instruction that inconsistent statements, made by witnesses testifying at the previous trial of Sorrell or in depositions, were only to be considered as impeachment. Defendant argued that, because the out-of-court statements had been made under oath, subject to cross-examination, limiting their use to impeachment was erroneous. The court rejected defendant's argument, citing *State* v. *Dragon*, 128 Vt. 568, 570, 268 A.2d 913, 914 (1970).

On appeal, defendant presents several arguments, based upon Vermont common law, the subsequently promulgated Vermont Rules of Evidence, and the Sixth Amendment to the United States Constitution.

A.

■ At the time of trial, March 16-24, 1983, Vermont's common law rule of evidence provided that prior inconsistent statements of a testifying witness were not admissible as substantive evidence. The common law rule, last upheld in *Dragon*, was changed by this Court's promulgation of V.R.E. 801(d)(1)(A)[2] of the Vermont Rules of Evidence, effective April 1, 1983.

■ Before April 1, 1983, the trial court was required to apply the common law rule unless presented with persuasive and authoritative reasons to depart therefrom. See *Miller* v. *Willimott*, 123 Vt. 448, 453, 193 A.2d 917, 920 (1963) (stare decisis applies when not in conflict with constitutional and statutory provisions). The common law rule strongly favored in-court testimony and generally disfavored statements made out of the jury's observation. The rule freely permitted attacks on a witness's credibility, memory, perception and communicative ability; freely permitted defendant to seek recantation by a witness; and freely permitted the jury to reject the accuracy or veracity of a witness's in-court testimony.

Defendant's reference to *State* v. *Lupien*, 135 Vt. 30, 370 A.2d 196 (1977), does not support his argument for admissibility. In *Lupien*, this Court ruled erroneous the trial court's exclusion of an incomplete and unsigned deposition that had *not* been offered as substantive evidence, but rather for impeachment. *Id.* at 32, 370 A.2d at 198. In holding the error harmless, this Court also held that the defendant's constitutional right to confrontation had not been denied because the defendant had had adequate opportunity to test the witness's recollection of events and place her credibility, as well as the theory underlying the defense, before the jury. *Id.* at 34-35, 370 A.2d at 199.

---

[2] V.R.E. 801(d)(1) provides in part:

A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to penalty or perjury at a trial, hearing, or other proceeding, or in a deposition . . . .

Nor does *State* v. *Roy*, 140 Vt. 219, 436 A.2d 1090 (1981), support defendant's argument. That case simply approved use of prior *consistent* statements, made before the motive to falsify arose, for the sole purpose of rebutting charges that in-court testimony had recently been fabricated. *Id.* at 227, 436 A.2d at 1093-94.

## B.

Despite the express provision in V.R.E. 1102(a) that the Rules of Evidence be inapplicable before April 1, 1983, defendant argues that general rules of retroactivity required application of V.R.E. 801(d)(1) to his trial. Defendant cites two authorities for this theory: *State* v. *Shattuck*, 141 Vt. 523, 529, 450 A.2d 1122, 1124-25 (1982), and V.R.E. 1102(a) itself.

As in other cases considering retroactive application of changes in the law, e.g., *United States* v. *Johnson*, 457 U.S. 537 (1982); *Solomon* v. *Atlantis Development, Inc.*, 145 Vt. 70, 483 A.2d 253 (1984), the topic in *Shattuck* was not a statute or rule with an express effective date, as here; rather, the topic was *case law*—"retroactivity of *judicial decisions* [announcing] a new rule of law." *Shattuck, supra*, 141 Vt. at 528, 450 A.2d at 1124 (emphasis supplied). This Court, in *Shattuck, id.* at 529, 450 A.2d at 1125, followed *Johnson, supra*, by adopting the common law rule applying judicial decisions changing the law to cases then on direct appeal. The rule in *Shattuck* does not apply to changes effected on a date certain by the promulgation of rules.

V.R.E. 1102(a) provides, in pertinent part, that the new rules of evidence apply in "all *further* proceedings in actions then pending, except to the extent that in the opinion of the court their application in a particular action pending when the rules take effect would not be feasible or would work injustice, in which event former evidentiary principles apply." (Emphasis added.) The pertinent language in V.R.E. 1102(a) echoes that of V.R.C.P. 86(a), whose Reporter's Notes explain, "the court has discretion to mold new provisions to the circumstances in actions pending at the effective date." However, defendant's motion for new trial made after April 1, 1983, did not convert the trial court's March 24 ruling upon his request to charge into a post-April 1 "further proceedin[g]" within the meaning of V.R.E. 1102(a). Nor has defendant demonstrated how the court's rejection, based upon *Dragon*,

of his assertion that the rule was wrong, "work[ed] injustice." V.R.E. 1102(a).

## C.

Defendant's constitutional claims, in essence, maintain that the orthodox common law rule against substantive use of prior inconsistent statements violated both the Sixth Amendment's Confrontation Clause, and the Sixth Amendment's provision assuring defendants the right to compulsory process.

### (i)

As the United States Supreme Court explained in *California* v. *Green*, 399 U.S. 149, 156 (1970), the Confrontation Clause originated because of the abusive prosecutorial practice of trying defendants on ex parte affidavits and depositions that denied defendants an opportunity to challenge accusers in face-to-face encounters under the eye of the factfinder.

In the present case, the evidence on which defendant bases his claim of deprivation consisted of prior out-of-court statements by witnesses, all of whom testified at trial. The identities of all witnesses had been provided to defendant in timely fashion. Defendant had free access to them by pretrial deposition. He was also free to impeach them with their prior statements at trial.

The holding in *California* v. *Green, id.* at 164, that the Confrontation Clause *permits* substantive use of out-of-court statements by a testifying witness who is subject to full cross-examination, did not constitutionally mandate that such statements *must* be admitted. As the Court stressed in *California* v. *Green, id.* at 155, its task was "not to decide which [position], purely as a matter of the law of evidence, is the sounder," but simply to assess whether defendant's confrontation right was satisfied.

Although the danger of admitting out-of-court statements is mitigated in circumstances where a testifying witness can be subject to prosecution for perjury, where cross-examination is permitted, and where the factfinder can observe the witness's demeanor, *id.* at 158, defendant has not established, either by authority or by force of reason, that the Confrontation Clause requires substantive consideration of prior out-of-court statements, notwithstanding Vermont's common law rule.

(ii)

We also reject defendant's claimed denial of compulsory process. The right of compulsory process originated in reaction to a "notorious" common-law felony rule that did not allow defendants to introduce witnesses. *Washington* v. *Texas*, 388 U.S. 14, 19 (1967). "[T]he Framers of the Constitution felt it necessary specifically to provide that defendants in criminal cases should be provided the means of obtaining witnesses so that their own evidence, as well as the prosecution's, might be evaluated by the jury." *Id.* at 20.

In this case, defendant was denied no right to put any witness on the stand. See *id.* at 23. Defendant's real problem is that, once witnesses took the stand, he was dissatisfied by what they said. However, unlike the situation in *Chambers* v. *Mississippi*, 410 U.S. 284 (1973), defendant was free to call those and other witnesses, free to elicit testimony and to cross-examine. He also had full opportunity to present his defense theory to the jury. Thus, defendant's "constitutional rights directly affecting the ascertainment of guilt," *id.* at 302, were not infringed.

## III.

Defendant next claims that the State's failure to disclose in a timely way statements of a key prosecution witness, in violation of V.R.Cr.P. 16(a) and 16.2(b), along with the court's refusal to delay the trial, requires reversal. The State does not deny its obligation to make continuing disclosure but responds that the court's order resulted in no prejudice because of defendant's own decision not to cross-examine the witness.

Two weeks before trial, witness Daniel Tobler told police that he had seen defendant, Sorrell and O'Neal walking toward the river on the night in question. However, the following day, when deposed by defendant, Tobler said he could not identify any of the three.

On Tuesday, the date of jury drawing, Tobler again spoke with police and reverted to his original statement. A copy of the latest statement was given to defense counsel on Wednesday. When the prosecutor visited Tobler on Wednesday night, Tobler explained that he had changed his story at deposition because of a threat against his life.

Defendant's attorney was informed of Tobler's explanation on Friday morning, the day on which Tobler was scheduled to testify. Defendant requested that Tobler's direct testimony be continued until defendant could further investigate the story and depose Tobler again.

The court decided to proceed with Tobler's direct testimony, in part because the jury was sequestered. The court authorized the State to question Tobler, subject to the condition that it not refer to the threat. The court authorized defendant to cross-examine Tobler fully on Friday afternoon, and also to recall Tobler for further examination, if desired after further investigation and redeposition.

On Friday afternoon, Tobler's direct testimony passed without mention of the threat. Thereupon, defendant did not cross-examine him that day, nor did defendant ever recall him for further testimony.

■ Defendant claims that his lack of opportunity to investigate the new information before Tobler testified was prejudicial error. However, Tobler's testimony did not address the new information, and defendant in fact was granted all the time he needed to investigate Tobler's recantation. Compare *State* v. *Evans*, 134 Vt. 189, 193, 353 A.2d 363, 366 (1976) (where court permits newly discovered State witness to testify, it should grant defendant sufficient preparation time); *State* v. *Howe*, 136 Vt. 53, 66-67, 386 A.2d 1125, 1133 (1978) (no showing that more time would have affected cross-examination).

Defendant's claim that he was *denied* immediate cross-examination is unsupported. Examination of the record reveals that he *declined* the opportunity. Further, defendant could have recalled Tobler to the witness stand at any time.

"Control of the order of proof and the limits of cross examination are of necessity committed to the trial judge who is responsible for the orderly progress of the trial. To be sure, his discretion must be soundly applied, with detached patience, understanding and fairness." *Children's Home, Inc.* v. *State Highway Board*, 125 Vt. 93, 98, 211 A.2d 257, 261 (1965); cf. V.R.E. 611, Reporter's Notes; see *State* v. *Tatko*, 119 Vt. 459, 463, 128 A.2d 663, 666 (1957) ("rules for the introduction of evidence . . . do not have the effect of conferring a right upon the parties litigant to any established pattern. . . . They yield to the sound discretion of

the trial judge when the circumstances demand it."). We find no abuse of the court's discretion.

## IV.

Citing *State* v. *Carter*, 138 Vt. 264, 415 A.2d 185 (1980), defendant next claims the court erred in rejecting his request to charge the jury that, to convict, it had to find beyond a reasonable doubt that he joined in a common criminal plan to kill Timothy O'Neal.

In accordance with 13 V.S.A. § 3, the court instructed the jury that a finding of participation "in the execution of the unlawful design" would support conviction and that "[m]ere presence . . . is not enough to establish participation. . . ." The court's instruction was a correct statement of Vermont law, allowing accessories to be adjudicated guilty as principals. "[T]he issue on review is simply whether a jury could reasonably conclude beyond a reasonable doubt that a preconceived [criminal] plan existed in which defendant participated." *State* v. *Bissonette*, 145 Vt. 381, 390, 488 A.2d 1231, 1236 (1985); accord *State* v. *Carter, supra*, 138 Vt. at 268-70, 415 A.2d at 187-88; *State* v. *Sears*, 130 Vt. 379, 382, 296 A.2d 218, 220 (1972); *State* v. *Barr*, 126 Vt. 112, 121-22, 223 A.2d 462, 469-70 (1966); *State* v. *Orlandi*, 106 Vt. 165, 171-72, 170 A. 908, 910-11 (1934).

Defendant's objection to the instructions focuses upon the court's failure to instruct the jury that, in order to convict, the common plan of defendant and Sorrell must have been to kill O'Neal, not merely to rob him. Defendant claims that the court's instruction permitted the jury to convict defendant for second degree murder if it found that defendant merely shared a goal to rob O'Neal. In essence, defendant claims that the charge allowed conviction for "felony murder."

When reviewing a court's charge, we must view it as a whole rather than piecemeal. *State* v. *Carter*, 142 Vt. 588, 592-93, 458 A.2d 1112, 1115 (1983). The court instructed the jury that defendant was charged with unlawfully killing O'Neal with malice aforethought. The judge explained that conviction required that the State prove four elements beyond a reasonable doubt: first, the identity of defendant as the perpetrator or one of the perpetrators; second, that he killed another human being; third, that the killing was without justification or excuse; and fourth, that

the killing was done with malice. Defendant did not object to the court's subsequent detailed explanations of each of these four elements. Nor has defendant appealed the court's instruction that, "if you find that the Defendant, without justification or excuse, inflicted a beating or participated in a beating upon the victim in any way likely to produce death, you may consider this as evidence of malice." Taken as a whole, the court's instructions made it clear that defendant had been charged with second degree murder and that that was the offense to which the court was referring throughout.

■ The evidence recited in Part I, *supra*, is sufficient to support a conclusion that defendant participated in the criminal act of second degree murder as a principal. As in *Barr, supra*, 126 Vt. at 122, 223 A.2d at 470, defendant "played his part as one of the principals by assisting in the commission of the offens[e] of which he was charged and found guilty." Based upon the evidence, a reasonable jury could conclude beyond a reasonable doubt that there was a common plan to kill O'Neal and that defendant had participated to a substantial measure in carrying it out; thus, defendant was punishable as a principal. *State* v. *Jaramillo*, 140 Vt. 206, 208, 436 A.2d 757, 759 (1981); *Sears, supra*, 130 Vt. at 382, 296 A.2d at 220; 13 V.S.A. § 3.

We find no error in the instructions.

### V.

Defendant claims that the court erred by excluding evidence of the acquittal of defendant's alleged accessory, Sorrell, after jury trial, and by instructing the jury that defendant could be convicted as an accessory, despite Sorrell's acquittal. This was not error.

■ Evidence that a jury has acquitted one of a group of alleged conspirators is not admissible to prove the innocence of an alleged co-conspirator, nor is the alleged co-conspirator entitled to a directed verdict of acquittal. *Burt* v. *United States*, 139 F.2d 73, 76 (5th Cir. 1943), *cert. denied*, 321 U.S. 799 (1944); *Commonwealth* v. *Cresta*, 3 Mass. App. Ct. 560, 563-64, 336 N.E.2d 910, 913-14 (App. Ct. 1975).

■ Similarly, the acquittal of an alleged principal does not collaterally estop the prosecution from seeking conviction of an

alleged aider and abettor. *Standefer* v. *United States*, 447 U.S. 10 (1980).

In Vermont there is no distinction between accessories before the fact and principals, and an accessory before the fact may be informed against, tried, convicted and punished as a principal. *State* v. *Sears, supra*, 130 Vt. at 381-82, 296 A.2d at 219-20; 13 V.S.A. §§ 3, 4. Regardless of whether defendant was convicted as a principal or, equivalently, as a participant in a common plan, the court's exclusion of evidence that another jury acquitted Sorrell was correct.

## VI.

At trial, defendant unsuccessfully challenged the participation of assistant judges at sentencing, claiming that, as county executives, their control of the sheriff's department budget prevented them from acting as impartial magistrates.

On appeal, defendant restructures his argument and for the first time claims that the participation of lay assistant judges denied him his constitutional rights to effective assistance of counsel, due process of law, and equal protection. Because these claims were not raised below, we will address them only if the assistant judges' participation in the sentencing amounted to plain error. *State* v. *Turner*, 145 Vt. 399, 403, 491 A.2d 338, 340 (1985).

We have previously held, and reiterate here, that the participation of lay assistant judges at sentencing does not deny a defendant due process of law or the effective assistance of counsel. *State* v. *Hunt*, 145 Vt. 34, 49, 485 A.2d 109, 117 (1984). Defendant's claims on these issues do not constitute plain error.

Under his equal protection claim, an issue not addressed by our decision in *Hunt*, defendant contends that the State's filing of the case in superior court, which is presided over by a law-trained superior judge and two assistant judges (usually lay persons), rather than in district court, where trial is before a single law-trained district judge, arbitrarily and unjustly obtained treatment more favorable to the State. Defendant's brief incorporates, by reference, legal arguments presented by other defendants in unrelated cases, without making any attempt to set forth the substance of his arguments for the benefit of the Court or opposing counsel. This constitutes inadequate briefing. *State* v. *Settle*, 141

Vt. 58, 61, 442 A.2d 1314, 1315 (1982). Even were the briefing adequate, defendant's argument is pure speculation. He has shown no prejudice and has not pointed to anything in the transcript that would justify his claim. This does not constitute plain error. *State* v. *Turner, supra,* 145 Vt. at 403, 491 A.2d at 340.

*Affirmed.*