## State of Vermont v. Harold Norton

[514 A.2d 1053]

No. 84-306

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed June 27, 1986

*Jeffrey L. Amestoy*, Attorney General, *David Tartter*, Assistant Attorney General, and *Steven Norten* and *John Glynn*, Law Clerks (On the Brief), Montpelier, for Plaintiff-Appellee.

*Martin and Paolini*, Barre, for Defendant-Appellant.

**Hayes, J.** Defendant, Harold Norton, appeals his conviction, following jury trial, of involuntary manslaughter.

Defendant raises several issues on appeal. First, he claims that the trial court erred in denying defense motions to dismiss for lack of probable cause and for lack of prima facie case, and defense motion for judgment of acquittal. Second, defendant asserts that the trial court erred in failing to order a mistrial after the prosecutor commented on defendant's refusal to cooperate with the authorities investigating the victim's death. Finally, defendant argues that the trial court erred in instructing the jury. We disagree with these contentions and affirm.

Robert Nisen died in the early morning of September 4, 1983, when his body struck the water in the Wells-Lamson Quarry in Barre Town, at approximately eighty-eight miles per hour. State police divers found Nisen's body the next day on a rock ledge about eight feet below water level.

The evidence concerning Nisen's death, viewed in the light most favorable to the State, and excluding the effect of modifying evidence, is summarized as follows. On Saturday night, September 3, 1983, a party was held at Quarry Hole No. Six in Barre Town. The victim arrived with Dwight Hull. Defendant arrived with David "Frenchy" Charette, in Charette's pick-up truck. At one point during the party, defendant and Hull had a brief altercation.

By about 2:00 a.m. on Sunday, September 4, only Nisen, Hull, Charette, and defendant remained at the party. When defendant and Charette drove away, Hull jumped into the back of Charette's truck. Nisen was unable to jump in before the truck sped off. Soon afterwards, Charette stopped the truck, and he and defendant forcibly ejected Hull. Charette hit Hull on the kneecap with a lead-weighted stick. Charette and defendant then drove off.

Hull rejoined Nisen, and they continued walking away from Quarry Hole No. Six. Shortly thereafter, Charette drove his pick-up back toward Nisen and Hull, apparently trying to run them

over. Hull and Nisen jumped from the truck's path. Charette then turned the truck around, drove back, and stopped by Nisen and Hull. Defendant apologized, and offered them a ride. Hull offered his hand to shake. Defendant became angered, and Charette again drove the truck off. At least once more, however, Charette drove by Nisen and Hull, either trying to scare them or run them over.

Defendant then stated something like, "I'm going to get him." Charette parked his truck off the road across from the Wells-Lamson Quarry, about six-tenths of a mile from Quarry Hole No. Six. When Nisen and Hull arrived near the truck, defendant, armed with a hammer belonging to Charette, leaped out and ran after the pair. Hull saw defendant raise his arm with the hammer in it, and heard a thumping sound. Hull ran off. He fell, and looked back to see defendant swinging the hammer at Nisen a second time. Hull glanced at his watch. It was 3:00 a.m. He ran to nearby houses and began knocking on doors. Someone let him in, and he telephoned the police.

Lieutenant David Roberts of the Barre Town Police responded to Hull's telephone call. He picked up Hull at the house from which he had called, and they drove to the Wells-Lamson Quarry, arriving at around 3:30 a.m. They searched for Nisen with several Barre City policemen who had arrived at the scene earlier. Nisen was not found. At around 4:00 a.m., Lt. Roberts drove off and spotted defendant lying on the lawn of a private residence. Lt. Roberts shined a spotlight on defendant, who immediately rose, and began walking toward the house, away from the police car. Lt. Roberts approached defendant, recognized him as a Norton, and asked if he was Albert Norton, one of defendant's brothers. Defendant said no, and instead told the police officer that he was Randy, one of his other brothers. Defendant said that his girlfriend had kicked him out, and that, while walking to Barre, he had fallen asleep. Lt. Roberts noticed that defendant's knuckles were bloody. Defendant explained that he had become angry at Charette for leaving him at a party, and had punched a piece of granite.

Two other officers of the Barre City Police then arrived at the scene. Defendant told them that after leaving the party he had gone to his sister's house. He explained his bloodied hand by saying that he had become angry while at his sister's house, and had punched a wall.

Charette testified that after defendant jumped from the truck to chase Nisen and Hull, defendant told Charette to leave. Charette drove off, and spent the rest of the night at the home of a woman he had recently met. On Sunday, Charette and his companion went to the home of defendant's girlfriend. Defendant was there. Charette asked defendant if he had Charette's hammer. Defendant responded, "Don't worry about it. It's long gone." In addition, defendant said, "You should have been there. I made $65.00. I pissed on his head and his eyes curled."

On Monday, September 5, Charette and his girlfriend drove to a farmhouse where they, and defendant, and several others had a party. That night, someone telephoned the farm to report that the quarries were being drained. At this point, defendant said that he and Charette should go to Massachusetts. Charette initially said that he did not want to go. Defendant said that he didn't want to leave Charette there to "narc him out," which, Charette's girlfriend explained, meant to tell on somebody. Charette eventually acquiesced, and he and defendant drove to Williamstown, Vermont. Charette's truck was low on gas. Charette drove back to Barre to fill it up. He stopped at the Morgan Store in Barre, and while there, several police officers arrived. Charette agreed to speak with them the following morning.

A detective spoke with defendant at the Morgan Store. Defendant told him that after leaving Quarry Hole No. Six with Charette, he had gotten out of the truck at the cemetery where Websterville Road intersects Quarry Hill Road.

Meanwhile, on Sunday, September 4, Hull began to search for his friend. He continued to look for Nisen on Monday. At about mid-afternoon on Monday, Hull found a five-dollar bill and a book of matches in the area between the Wells-Lamson Quarry access road and Websterville Road. He searched further and found bloodstains by the edge of the quarry, and several coins. Hull then sent for the police.

A state policeman called to the Wells-Lamson Quarry found blood spots and coins on a ledge above the quarry. The blood spots were four to five feet from the quarry's edge. Four samples of the blood were consistent with the defendant's blood type, and that of only one and one-half percent of the general population. The remaining samples were all consistent with defendant's blood type, and inconsistent with the blood types of Nisen, Hull, and Charette.

The next morning, a team of state police divers located Nisen's body against the wall of the quarry, directly below the edge where the bloodstains were found. A distance of 260 feet separated the top of the quarry from the surface of the water.

An autopsy was performed on Nisen's body. It was concluded that Nisen died of multiple blunt trauma due to a fall from a great height. The autopsy also revealed that Nisen's hyoid bone, located under his jaw, was fractured. Furthermore, the autopsy showed no injuries on the head or neck area that would have been caused by a hammer blow. Any injuries to the left side of the chest wall and abdomen which would have been caused by a hammer blow, however, would have been obscured by the extensive injuries resulting from the fall.

## I.

## A.

Defendant argues first that the trial court erred in denying his motion for review of probable cause. We disagree.

On December 5, 1983, defendant moved for a review of probable cause on grounds that the information charging defendant with murder failed to provide the specific act which the State claimed resulted in Nisen's death. The State subsequently amended the information to allege that defendant murdered Nisen by causing him to fall into the Wells-Lamson Quarry. Thus, defendant's objection was remedied before trial.

Defendant asserts on appeal, however, that two of the facts contained in the affidavits of probable cause were subsequently found to be untrue, and that without these facts, no probable cause existed to charge defendant. The two facts in question are: first, that Hull saw defendant strike Nisen with a hammer, when, in fact, Hull testified that he merely saw defendant raise his arm above Nisen with the hammer, and then heard a thump; and second, that bloodstains were found at the scene, when, in fact, the bloodstains were those of defendant, and not of Nisen.

In a motion testing probable cause, the "review is made solely on the pre-existing record. There is no right to cross-examine witnesses or offer new evidence." Reporter's Notes, V.R.Cr.P. 5(h). The trial court "must assume circumstances equivalent to those existing and applicable to a hearing at the time of the challenge." *State* v. *Perry,* 131 Vt. 75, 77, 300 A.2d

615, 615 (1973). Defendant's argument is based upon subsequently discovered evidence. Therefore, his challenge to the probable cause determination is without merit because the sufficiency of affidavits to support an information is to be judged by the affidavits on their face.

Furthermore, a challenge to probable cause following trial and conviction is untimely. The purpose of the requirement of probable cause "is to assure that persons are not proceeded against criminally without good reason." *State* v. *Kelly,* 131 Vt. 582, 589, 312 A.2d 906, 910 (1973). "[I]f the case is sufficient to go to the jury, and if the jury finds guilt beyond a reasonable doubt, then there was probable cause to prosecute." *Id.* at 590, 312 A.2d at 910.

Finally, probable cause to charge defendant existed even if the affidavits are viewed in the light of subsequent factual findings. The difference between Hull's account in the affidavit and his trial testimony was not so great that it could have affected the probable cause determination. In addition, the affidavit simply stated that bloodstains were found, without identifying them as Nisen's. The fact that the bloodstains found above Nisen's body were later discovered to be those of defendant does not affect the review of probable cause.

## B.

Defendant next argues that the trial court erred in denying his motion to dismiss for lack of a prima facie case. In his motion, defendant claimed that the State would be unable to prove the specific elements of first degree murder, that is, killing a human being with premeditation or deliberation.

The standard controlling a motion to dismiss for lack of prima facie case, V.R.C.P. 12, is the same as that for a motion for judgment of acquittal under V.R.Cr.P. 29. *State* v. *Burnham,* 145 Vt. 161, 165, 484 A.2d 918, 921 (1984). The test, as elucidated in the Reporter's Notes to Rule 29(a), is "whether, taking the evidence in the light most favorable to the state and excluding modifying evidence, the state has introduced evidence fairly and reasonably tending to show the defendant guilty beyond a reasonable doubt."

Defendant specifically contends that the trial court erred in denying his motion to dismiss because no direct evidence ex-

isted that he threw Nisen into the quarry. Direct evidence, however, is unnecessary. "Circumstantial evidence will sustain a conviction if it is sufficient to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *State* v. *Miller,* 146 Vt. 164, 169, 502 A.2d 832, 835 (1985) (citations omitted).

In the instant case, the evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that defendant killed Nisen by throwing him into the quarry. The court's findings of fact accompanying its order on defendant's motion indicated the following: that Hull saw defendant with a hammer raised above Nisen; that Charette heard defendant threaten Nisen; that defendant later made statements to Charette that indicated that he had assaulted and robbed Nisen; that Nisen had injuries consistent with strangulation, and could have been struck with a hammer; that Nisen died by falling into the quarry; that defendant's blood was found at the edge of the quarry above Nisen's body; and finally, that defendant had a bloody hand on the night of the attack. The trial court did not err in denying defendant's motion to dismiss for lack of a prima facie case.

## C.

Defendant also contends that the trial court erred in denying his motion for a directed verdict of acquittal at the close of the State's case. The standard used in deciding a motion for a directed verdict of acquittal is the same as that used in determining a motion to dismiss for lack of a prima facie case. *State* v. *Burnham, supra,* 145 Vt. at 165, 484 A.2d at 921.

In this case, the jury could reasonably have found beyond a reasonable doubt that defendant assaulted Nisen with a hammer. Although no injuries consistent with a hammer blow were discovered on Nisen's body, such injuries would have been obscured by the massive bruising caused by the fall into the quarry. Charette testified that defendant grabbed a hammer as he left the truck, after threatening to "get him." Hull saw defendant raise the hammer above Nisen, and seconds later heard the sound of a blow. Immediately thereafter, he saw defendant swing the hammer at Nisen a second time.

The State introduced evidence that Nisen had a series of bruises and scrapes on his abdomen, a bruise on his belt line, and

injuries that suggested strangulation. The jury could reasonably have found that defendant and Nisen were left alone in the immediate vicinity of the quarry, that Nisen was then strangled until unconscious, and that he was dragged by his belt to the edge of the quarry, and thrown or pushed over the edge.

Additional evidence was presented to permit the jury to reasonably find that defendant caused Nisen to go over the quarry's edge to his death. Defendant's blood was found directly above Nisen's body, at the edge of the quarry. In addition, defendant misidentified himself to a police officer soon after leaving the quarry, and he gave a false story of his movements that night. He later gave a second false story to a different police officer that night, and a third false story to another police officer the following day. When he learned that the quarry was being searched, defendant made designs to leave the state, and insisted that Charette join him, permitting an inference that he did so to prevent Charette from talking to the police.

Defendant suggests that, under the State's evidence, a jury could reasonably have found that he stumbled around in the dark, over and around granite blocks, and arrived by chance at the top of a 260 foot cliff, directly above the place where Nisen's body was found. This suggestion, however, is unreasonable, and strains credulity in light of all the other evidence demonstrating the defendant's guilt. The trial court did not err in denying defendant's motion for a directed verdict of acquittal.

## II.

Defendant next argues that the trial court erred in failing to order a mistrial after the prosecutor, during closing argument, commented on defendant's refusal to cooperate with the authorities investigating Nisen's death. We disagree.

The prosecutor argued that the statements defendant gave to the police were consistent with those of a guilty person. He then compared defendant's action to those of Charette, and argued that Charette's actions were inconsistent with guilt. Defendant specifically contends that the prosecutor, by referring to defendant's refusal to give a written statement, impermissibly commented on his constitutional right to remain silent, in violation of *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

■ The United States Supreme Court in *Jenkins* v. *Anderson,* 447 U.S. 231 (1980), addressed the issue of whether the use of prearrest silence to impeach a criminal defendant's credibility is unconstitutional. In closing argument to the jury, the prosecutor referred to defendant's failure to report for two weeks a killing claimed to be in self-defense. The prosecutor suggested that if the killing had been in self-defense, defendant would have reported it earlier. Defendant claimed that this suggestion violated his Fifth Amendment right to remain silent. The court, however, disagreed, and held that neither the Fifth Amendment nor fundamental fairness guaranteed by the Fourteenth Amendment is violated by the use of prearrest silence to impeach a criminal defendant's credibility. *Id.* at 238, 240. The court reasoned that no governmental action induced defendant to remain silent before arrest, and that the failure to speak occurred before defendant was taken into custody and given *Miranda* warnings. *Id.* at 240.

*Fletcher* v. *Weir,* 455 U.S. 603 (1982), reaffirmed *Jenkins.* In *Fletcher*, the prosecutor cross-examined defendant on his failure to offer an exculpatory explanation of a stabbing at the time he was arrested. Even though defendant was under arrest at the time, the court found no constitutional error in the cross-examination. The court held that, absent "some sort of affirmative assurances embodied in the *Miranda* warnings . . . [it does not violate] due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Id.* at 607.

■ In the instant case, defendant had not been arrested nor given *Miranda* warnings when he refused to give a written statement. Defendant himself testified, "I asked . . . if I was under arrest . . . and he said something like: 'No, you're not under arrest. If you want we'll stop the cruiser and let you out right here . . . .' " Because the defendant was free to leave, he was not in custody, and the *Miranda* warnings were not required. See *State* v. *Willis,* 145 Vt. 459, 475, 494 A.2d 108, 117 (1985) (in determining when a suspect has been taken into custody or deprived of his freedom for *Miranda* purposes, courts should objectively inquire into the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning). Thus, the prosecutor did not commit constitutional error in commenting on defendant's refusal to co-

operate with the police, and the trial court did not err in failing to order a mistrial.

## III.

### A.

Defendant argues that the trial court made several errors in instructing the jury. First, defendant contends that the court erred when it instructed the jury on the lesser-included charge of involuntary manslaughter.

Involuntary manslaughter is a killing " 'caused by an unlawful act, but not accompanied with any intention to take life.' " *State v. Poirier,* 142 Vt. 595, 598, 458 A.2d 1109, 1111 (1983) (quoting *In re Estate of Mahoney,* 126 Vt. 31, 35, 220 A.2d 475, 478 (1966)). Intent to cause death is a necessary element of both first and second degree murder. *In re Dunham,* 144 Vt. 444, 447-48, 479 A.2d 144, 146 (1984).

In this case, in order to convict defendant of first or second degree murder, the jury would have had to infer that defendant intended to cause Nisen's death by causing him to fall into the quarry. Despite finding that defendant did cause Nisen to fall into the quarry, the jury may have rejected the inference that he intended to cause Nisen's death. For example, the evidence justified a jury finding that defendant was too intoxicated to form the requisite intent. Here, the defendant drank two six packs or more of beer, plus some whiskey and some brandy. See *State v. Joyce,* 139 Vt. 638, 639-40, 433 A.2d 271, 272 (1981) (evidence of either voluntary or involuntary intoxication may be introduced to show that defendant could not have formed the necessary intent when specific intent is an element of crime).

The jury may also have concluded that defendant, being intoxicated, thought that Nisen was already dead when he was thrown into the quarry. The evidence indicated that Nisen may have been unconscious due to choking at the time he went over the edge. From this perspective, the evidence supports a charge of involuntary manslaughter because defendant acted unlawfully (he threw Nisen into the quarry), but without an intent to kill (because he may have thought that Nisen was already dead).

In sum, enough evidence was presented at trial to allow a reasonable jury to believe that defendant unintentionally caused

Nisen's death. Thus, the trial court did not err in instructing the jury on the lesser included offense of involuntary manslaughter.

## B.

Next, defendant argues that the trial court erred in refusing to instruct the jury on the lesser-included offenses of aggravated and simple assault. We disagree.

A defendant is entitled to an instruction on a lesser-included offense if the evidence supports a finding of guilt on the offense. We agree with the Supreme Judicial Court of Massachusetts, which adopted the rule that, in a homicide prosecution, "there must be an instruction on assault and battery if, but only if, the evidence raises a reasonable doubt that the acts of the defendant did not cause the victim's death." *Commonwealth* v. *Myers,* 356 Mass. 343, 350, 252 N.E.2d 350, 354 (1969).

In the instant case, defendant was charged with causing Nisen's death by actions which resulted in Nisen's fall into the quarry. The State's medical expert and the defendant's medical expert both testified that Nisen died from the fall into the quarry. We believe that the evidence, viewed as a whole, does not raise a reasonable doubt that the acts of the defendant did not cause the victim's death. Thus, defendant was not entitled to an instruction on assault and battery, and the trial court did not err in refusing to instruct the jury on the lesser-included offenses of aggravated and simple assault.

## C.

Finally, defendant argues that the trial court erred in refusing to instruct the jury that "[t]he defendant is not on trial for any act or conduct not alleged in the information." This instruction was required, defendant asserts, because the following evidence was presented at trial: defendant had been convicted of forgery in 1977; defendant faced revocation of probation for driving under the influence of alcohol; defendant had been drinking in violation of his probation; defendant had left the state in violation of his probation; defendant had used regulated drugs; defendant had assaulted Dwight Hull and Robert Nisen with a hammer.

Concerning the forgery conviction, the trial court informed the jury of the limited purpose for which they could use this informa-

tion, and that forgery was not the subject of the current prosecution:

> Now, you have heard evidence that the defendant has been previously convicted of the crime of forgery. You may consider that evidence only as it may affect the defendant's believability as a witness. You may not consider a prior conviction as evidence of guilt of this crime for which he is not here on trial.

An additional cautionary instruction would have been superfluous as to defendant's forgery conviction.

Next, we examine the evidence of defendant's drinking, taking drugs, and fighting, in relation to the trial court's instructions. Crimes which form a body of evidence relating to the events surrounding the crime of which a defendant is charged are part of the res gestae, and do not require a cautionary instruction. *State* v. *Gray,* 235 Kan. 632, 635, 681 P.2d 669, 672 (1984). In this case, the crime of drinking in violation of probation, taking drugs, and fighting with Hull and Nisen were events which surrounded the commission of the crime with which defendant was charged. Therefore, the trial court did not err in failing to give a cautionary instruction concerning these events. See also *Evans* v. *State,* 401 S.W.2d 602, 603-04 (Tex. Crim. App. 1966) (evidence that defendant was under the influence of a drug at the time of her arrest was admissible as res gestae and did not require a limiting instruction).

We view a court's charge as a whole, rather than piecemeal. *State* v. *Miller, supra,* 146 Vt. at 175, 502 A.2d at 839. " '[I]f, as a whole [the charge] breathes the true spirit and doctrine of the law, and there is no fair ground to say that the jury has been misled by it, it ought to stand.' " *State* v. *Bishop,* 128 Vt. 221, 230, 260 A.2d 393, 399 (1969) (quoting *Fassett* v. *Town of Roxbury*, 55 Vt. 552, 556 (1883)).

In this case, we believe that the trial court's instructions, taken as a whole, indicate that the only crimes for which defendant was on trial were first and second degree murder, and voluntary and involuntary manslaughter. No reasonable juror could have thought defendant was on trial for violation of probation, or DUI, or for assault, or for drug use. Therefore, the trial court did not err in failing to give a cautionary instruction concerning the other

"crimes" revealed by the evidence.

*Affirmed.*