No. 14812

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

BONNIE LEE HOFFMAN,

Defendant and Appellant.

Appeal from: District Court of the Fourth Judicial District,
In and for the County of Missoula
Honorable Jack L. Green, Judge presiding

Counsel of Record:

For Appellant:

Garnaas, Hall, Riley & Pinsoneault, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert L. Deschamps III, County Attorney, Missoula,
Montana

Submitted on briefs: October 1, 1981

Decided: January 14, 1982

Filed: JAN 1 4 1982

_____
Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

The defendant, Bonnie Lee Hoffman, was charged with negligent homicide under section 45-5-104, MCA, based on her failure to provide medical attention for her three-year-old son. She was convicted after a jury trial in the District Court of the Fourth Judicial District, Missoula County, and received a ten-year suspended sentence.

Bonnie Lee Hoffman met Kinley Dobson in 1974 when they were both living in Cut Bank, Montana. The defendant was sixteen at the time; Dobson was twenty-four and married. The defendant became pregnant by Dobson, and on February 16, 1975, their son, Chad, was born. Dobson and the defendant did not get married at this time but continued to see one another periodically over the next few years.

Dobson and the defendant had a volatile and violent relationship, which ended with the death of their young child.

In August 1977, Dobson and the defendant married. They lived together in Missoula, Montana, where defendant had a job as a key-punch operator at a bank. She worked from about 2:00 p.m. until 10:00 p.m. Dobson was unemployed and stayed at home with their two-year-old son, Chad.

After about a month, the relationship again turned violent. Dobson frequently threatened the defendant and physically abused both her and the child. In December 1977, after defendant had stayed with friends and in a shelter for battered women, she divorced Dobson.

Dobson, nevertheless, continued to live at the defendant's apartment, staying with Chad while defendant worked. Defendant testified that she could not make Dobson leave.

She had tried to lock him out of the house, but he always forced his way back in by coming through the windows or picking the lock on the door.

On February 22, 1978, Chad was taken to the hospital by Dobson. Chad's body was covered with numerous bruises. He had a severely distended stomach and was showing no sign of life. The child was pronounced dead at the hospital. The cause of his death was extreme shock resulting from a ruptured stomach.

In statements to the police and in her own testimony at trial, defendant outlined the role she played in Chad's death. When she woke up at about 11:00 a.m. on February 22, Chad seemed fine. She said that she gave the child his lunch, including some cake. Defendant recalled that Dobson became angry because she had given Chad cake when he had not finished his sandwich. She testified that while she was watching television, Dobson was whispering what she assumed were threats to the boy and the boy responded by yelling, "No! No!" and hitting Dobson. Then the boy yelled, "Mommy, my tummy hurts."

Defendant left for work at about 2:00 p.m. that afternoon. Dobson called her at work at about 3:00 p.m. saying that Chad had been vomiting. Defendant told Dobson to give Chad some Pepto-Bismol. At about 4:15 that after-noon, Dobson called again saying that Chad had fallen down some stairs while riding his tricycle and was hurt badly.

Defendant did not believe that Chad was hurt badly because Dobson called her at work many times each day, trying to persuade her to come home. Dobson would generally say that she should come home because Chad was hurt. The

defendant told Dobson she would be home for her break at 5:00 p.m. Defendant returned home about 4:50 that afternoon. Chad was conscious but pale. He had blood on his nose and mouth, and his stomach was swollen.

Chad went limp when the defendant placed him in his high chair and looked, according to defendant, "exhausted" and "uncomfortable." Also, according to defendant, he was able to drink a small amount of Seven-Up.

Not recognizing that Chad was seriously ill, defendant when back to work at approximately 5:30 p.m. As soon as she arrived at work, she received a message that Dobson had called and he was taking Chad to Saint Patrick's Hospital. Defendant called the hospital to make sure that Dobson was there and then left.

Chad showed no signs of life when Dobson brought him into the hospital at 6:00 p.m. The doctors in the emergency room tried to revive the boy, but at 6:45 p.m. Chad was declared legally dead.

The doctor on duty at the emergency room when Chad was brought in testified that Chad had bruises on nearly every part of his body--his legs, buttocks, back, face and arms--and that he was in extreme shock. The doctor further testified that forty-five minutes prior to Chad's arrival at the hospital, it would have been obvious that he was seriously ill.

A pathologist performed an autopsy on the child's body the day after his death. The pathologist testified that the bruises on the child's stomach were about the same age as the others and had occurred two to five hours before death. The large bruise on the child's stomach, according

-4-

to the pathologist, was caused by a blunt force. The pathologist further testified that there was evidence of prior injuries both to the child's skull and stomach.

Defendant raises two issues on review: (1) whether there is sufficient evidence to support the jury's verdict that she was guilty of negligent homicide because she failed to provide medical attention for her small child; and (2) whether the District Court erred by admitting into evidence color slides of the dead child taken by the pathologist prior to the autopsy.

Because there is substantial evidence to support the verdict and because the probative value of the slides out-weighed any prejudicial effect, the defendant's conviction is affirmed.

Under section 40-6-211, MCA, a parent entitled to custody of a child must provide the child with support and education suitable to his circumstances. In State v. Mally (1961), 139 Mont. 599, 366 P.2d 868, we concluded that the failure to obtain medical aid for one who is owed a duty is a sufficient degree of negligence as to constitute involuntary manslaughter, provided death results from a failure to act. 366 P.2d at 872. Likewise, in State v. Bischert (1957), 131 Mont. 152, 308 P.2d 969, we noted that an omission to perform an act required by law can be the basis for manslaughter. See also, State v. Parmenter (1968), 74 Wash.2d 343, 444 P.2d 680; Palmer v. State (1960), 223 Md. 341, 164 A.2d 467; and for a discussion of homicide based on failure to provide medical attention see, 100 A.L.R.2d 483. The defendant here would be guilty of negligent homicide if, by failing to provide medical attention for her son, she

disregarded a risk of which she should have been aware, and the risk was so great that to disregard it was a gross deviation from a reasonable standard of conduct. See section 45-5-104, MCA, and section 45-2-101(37), MCA.

The facts surrounding Chad's death support the jury's finding that defendant grossly deviated from a reasonable standard of care when she failed to provide medical attention for her three-year-old son. Defendant's own testimony, the testimony of the doctors in the emergency room, and the testimony of the pathologist show that on February 22, 1978, Chad was seriously ill at 5:00 p.m. when defendant came home for her break. According to the emergency room doctors, the seriousness of Chad's injuries would have been obvious to anyone. Further, they testified that had Chad been brought to the hospital while conscious and able to drink liquids, in all likelihood his life could have been saved.

By disregarding the seriousness of Chad's injuries—the bruises on his body, his vomiting, the blood on his nose and mouth, the distention of his stomach, his pallor and the dilation of his eyes—defendant acted negligently within the meaning of section 45-2-101(37), MCA. Defendant refused to acknowledge to herself that Chad was seriously ill. The record shows ample proof of Chad's obvious need for medical care and defendant's failure to provide it.

Defendant next contends that the admission of color slides taken by the pathologist prior to the autopsy were too prejudicial and were submitted only to arouse the sympathies of the jury. Defendant claims that the color slides were not necessary since the black and white photographs of the child taken by a policeman at the hospital

were sufficient to show Chad's death. Citing State v. Bischert, supra, defendant claims the color slides should have been excluded.

It is well established in this state that the trial court has the discretion to allow into evidence duly verified photographs to aid the jury in its fact-finding process. State v. Mackie (1981), ___ Mont. ___, 622 P.2d 673, 38 St.Rep. 86. As we stated in the often-quoted case of Fulton v. Choteau County Farmers' Co. (1934), 98 Mont. 48, 37 P.2d 1025, 1029:

> ". . . photographs stand on the same footing as diagrams, maps, plans, and the like, and as a general rule, whenever relevant to describe a person, place, or thing, they are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case."

Here, because the color slides showed the extent of Chad's injuries more clearly than the black and white photographs, they helped the jury to determine the reasonableness of the defendant's actions.

While we found that admission of the color slides in Bischert was reversible error, we emphasized that failure to provide medical care was not in issue. Here, the defendant's failure to provide medical attention is the central and controlling issue. Further, the pathologist in Bischert said he did not need the colored slides to explain his findings. Here, the pathologist explicitly testified that he preferred to use his own color slides in order to be as accurate as possible.

The color slides are therefore admissible since their probative value outweighed any prejudicial effect they may have had. See State v. O'Donnell (1972), 159 Mont. 138, 496

P.2d 299.

The judgment of the District Court is affirmed.

_____
                    Justice

We concur:

_____

_____

_____

_____
Justices

-8-