# State of Vermont v. Janet Valley

[571 A.2d 579]

No. 83-534

Present: **Allen, C.J., Peck, Gibson, Dooley and Mahady, JJ.**

Opinion Filed March 31, 1989

Mandate Stayed April 14, 1989; Motion for Reargument Denied May 23, 1989;
Stay of Mandate Dissolved December 29, 1989

382

*Philip H. White,* Orleans County State's Attorney, and *Gary J. Karpin,* Deputy State's Attorney, Newport, for Plaintiff-Appellee.

*Martin and Paolini,* Barre, for Defendant-Appellant.

**Dooley, J.** Defendant appeals her conviction for manslaughter, 13 V.S.A. § 2304, in the death of her infant daughter. We affirm.

On June 25, 1981, Jordan Lee Valley, a seven month old infant, was found dead in defendant's home. After an autopsy, the medical examiner determined that the cause of the child's death was asphyxiation due to vomit in her air passages. The autopsy also revealed a blood alcohol level of 0.114% ethanol weight by volume.[1] The medical examiner who performed the autopsy concluded—and later testified—that the ingestion of alcohol "almost certainly produced the vomiting problem that led to the vomitus being aspirated into the lungs." In addition to the presence of alcohol, there were a number of other conditions that, according to the doctor, were possible factors in Jordan's death.

Indications from the autopsy were that Jordan was the victim of protracted child abuse. The examining physician observed: a hemorrhage on the child's brain; chips on all her teeth; bruises and lacerations about her face, head, and neck; a large first, second, and third degree burn over the child's right hip, thigh, lower leg, and genitalia; numerous other bruises and puncture-type marks; several fractured ribs; a fractured right elbow; several "chipped fractures" of the leg; and fractures of the skull on the right side and the back. The degree of healing of these injuries—for all of which no medical attention was provided—

---

[1] Evidence indicates that the infant was force fed alcohol as a way to settle her and keep her from crying. Baby bottles containing vodka were found in defendant's home.

ranged from several days to a number of weeks. But some eluded placement in a time frame. Also, a failure to thrive was indicated by the fact that Jordan, whose birth weight was in the fifty-seventh percentile on growth charts, was only in the third percentile at the time of her death. Chemical tests indicated that she was suffering from dehydration and malnutrition at the time of her death. Bacteria—staphylococcus and streptococcus—were discovered in her blood and spleen. She showed signs of bronchial pneumonia, which testimony indicated was probably caused by the aspiration of vomit over a period of time.

The medical examiner concluded that the accumulation of these injuries contributed to Jordan's death in two ways. First, they could have caused the child to go into a state of shock leading to vomiting. Second, "the injuries would have resulted in a weakened . . . unhealthy child who could not then cope with the added ingestion of alcohol and made the child more vulnerable to the vomiting that resulted in death."

In August of 1981, the State filed a two count information charging defendant with child abuse, 13 V.S.A. § 1304, and manslaughter, 13 V.S.A. § 2304. On October 9, 1981, defendant filed notice of her intent to raise the insanity defense under V.R.Cr.P. 12.1(a). The information was amended in July of 1982. And the case went to trial on the amended information, which charged in two counts as follows:

COUNT I:    [Janet D. Valley] recklessly and wantonly engag[ed] in conduct, to wit: being the natural mother and having custody, charge and care of Jordan Lee Valley, a human being, DOB: 12/2/80, and therefore having a duty to care for Jordan Lee Valley, failed to obtain appropriate medical care and treatment for said child, which conduct involved a high degree of risk of death or serious bodily injury to Jordan Lee Valley and did as a result thereof unlawfully cause the death of Jordan Lee Valley, all in violation of 13 V.S.A. § 2304

. . . .

COUNT II: [Janet D. Valley] [b]eing a person over the age of sixteen years old, to wit: 18 years old, having the custody, charge and care of a child under ten years of age, to wit: Jordan Lee Valley, DOB: 12/2/80, did then and there willfully ill treat and neglect said child in a manner to cause such child unnecessary suffering and endanger her health, all in violation of 13 V.S.A. § 1304 . . . .

The case was tried to a jury from June 28 through July 9, 1983. The two counts of the information were presented as alternative charges, and the jury returned a verdict finding defendant guilty of manslaughter as charged in the first count of the amended information. Because of this verdict the second count was dismissed.

On appeal, defendant raises seven issues. First, she claims that she was prejudiced by the wrongful admission of testimony tending to demonstrate that she fit the "profile" of a child abuser, while, at the same time, improperly attacking her insanity defense. Second, defendant alleges that the trial court erred in denying her motion for acquittal on Count I at the close of the State's evidence. Third, defendant contends that the trial court committed constitutional error by preventing her from calling for evidence in her favor. Fourth, she argues that the trial court improperly allowed the admission of testimony in violation of her physician-patient privilege. Fifth, she claims that the trial court erred in permitting testimony by a State appointed psychiatrist about the alleged offense underlying the examination. Sixth, she contends that the jury instructions were confusing and misleading. And, last, defendant argues that the trial court's instructions to the jury removed an essential element of the charged offense from jury consideration. We address each of these arguments in the order they are raised.

In her first argument, defendant contends that a part of the testimony of the District Director of the Vermont Department of Social and Rehabilitation Services in Newport was improperly admitted. The Director testified as an expert witness on child abuse that the "findings" in the literature on child abuse

are that "the incidence of mental illness is no greater among child abusers than it is in the general population." This testimony was based on the witness' familiarity with the literature. Defense counsel objected to this testimony on numerous grounds. On appeal, defendant argues that the testimony was inadmissible because it is irrelevant and prejudicial to the defendant.[2] We find that the evidence was admissible.

The evidence can create a ground for reversal only if it was inadmissible either because it was irrelevant or because its probative value is substantially outweighed by the danger of unfair prejudice. See V.R.E. 401, 402, 403. Defendant first argues that it is irrelevant because it is *res inter alios acta,* that is, the evidence is not about acts or events involved with this case. Defendant finds some support for this position in *State v. Percy,* 146 Vt. 475, 507 A.2d 955 (1986), a case in which we found inadmissible certain alleged "profile or syndrome evidence." *Percy* involved a rape prosecution in which defendant's sanity was the main issue and defendant claimed that he had no memory of the sexual assault. The prosecution elicited from its psychiatric witnesses that rapists typically claim either consent or amnesia. This Court found that the testimony was not profile evidence since it "in no way concerns a physical, emotional, or mental condition" that could support a profile diagnosis. 146 Vt. at 483, 507 A.2d at 960. Instead, the Court found it to be a direct attack on defendant's credibility intended to show the jury that defendant must be lying if he claimed amnesia. Thus, we found irrelevant what other rapists give as defenses. *Id.* at 484, 507 A.2d at 960.

*Percy* does not stand for the proposition that evidence that reflects research on the characteristics of persons in a certain

---

[2] The witness also went on to testify about the typical characteristics that exist in abusive families. The evidence was not specifically directed at an element of the defense or characteristics of the defendant, and the witness did not testify to whether defendant exhibited any of the typical characteristics of a child abuser. We have not analyzed this evidence in detail because the defendant has not emphasized it here. We find it to be profile evidence of the kind found admissible in *State v. Catsam,* 148 Vt. 366, 534 A.2d 184 (1987). Further it relates primarily to the offense—child abuse—for which the defendant was not convicted and would not be grounds for a reversal.

position is irrelevant. That reading of *Percy* was clearly rejected in *State v. Catsam*, 148 Vt. 366, 369–70, 534 A.2d 184, 187 (1987), where we allowed evidence of "a profile of a child who has been sexually abused [including] both emotional and physical characteristics." Thus, *Catsam* necessarily answers the argument that the testimony here must be irrelevant because it is not about the defendant and her mental condition but is instead about others.

Vermont has adopted the federal rule on relevance. See V.R.E. 401. It contains a broad definition of relevant evidence to include evidence "having any tendency" to make the existence of a fact of consequence to the action more or less probable. See Reporter's Notes to V.R.E. 401. The State's theory of relevance is that the evidence dispels what could be a myth that someone who could abuse a child must not be sane. Thus, the argument that the testimony is relevant is similar to the argument that we adopted for profile evidence in *Catsam*—that it will help the jury understand the evidence. See *Catsam*, 148 Vt. at 369, 534 A.2d at 187. The evidence meets the test of V.R.E. 401. See generally McCord, *Syndromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases*, 66 Or. L. Rev. 19, 79–81 (1987).

Because the evidence is offered as expert testimony, it must also meet the requirement of V.R.E. 702—that the testimony of the witness will "assist the trier of fact to understand the evidence or to determine a fact in issue."[3] Again, compliance with the rule is shown in *Catsam*. 148 Vt. at 371, 534 A.2d at 188. Just as the syndrome evidence introduced in *Catsam* helped the jury understand the evidence bearing on whether the victim had been sexually assaulted by the defendant, the evidence here helped the jury understand the interrelationship of sanity and child abuse. It met the V.R.E. 702 test.

---

[3] Defendant has not, on appeal, attacked the credentials of the Director as an expert witness or the foundation for the testimony given. The testimony was based on the literature, and the trial judge could find that it met the foundational requirements of V.R.E. 703.

■ The more difficult question for us is whether the evidence fails the balancing test of V.R.E. 403 because its probative value is substantially outweighed by the danger of unfair prejudice. At the outset, we note that the trial judge has substantial discretion in ruling on V.R.E. 403 motions. See *State v. Larose,* 150 Vt. 363, 368, 554 A.2d 227, 231 (1988); *State v. Parker,* 149 Vt. 393, 400–02, 545 A.2d 512, 516–18 (1988). We think it also important that the element that has been deemed the most critical in showing prejudice in cases like this—the direct bearing on victim or defendant credibility—is wholly absent in this case. Thus, in *Catsam,* we found profile testimony admissible but found inadmissible testimony that victims fitting the "profile" generally tell the truth. We found such testimony to be "a direct comment on the credibility of the claimant." *Catsam,* 148 Vt. at 370, 534 A.2d at 188. We noted further that such testimony does not meet the test of V.R.E. 702 because credibility is not a fact in issue. *Id.* at 371, 534 A.2d at 188; see also *State v. Hicks,* 148 Vt. 459, 462, 535 A.2d 776, 778 (1987) ("'[S]o long as the expert does not render an opinion on the accuracy of the victim's recitation of facts, his or her general testimony on the dynamics of sexual abuse does not prejudice the jury.'" (quoting *Commonwealth v. Baldwin,* 348 Pa. Super. 368, 376–77, 502 A.2d 253, 257 (1985))).

The evidence in this case doesn't even indirectly bear on the credibility of the defendant or the victim. Its sole purpose is to explain the relationship between insanity and child abuse. Thus, it lacks the prejudicial impact that has concerned this Court in other cases.

We also note that the evidence does not go directly to defendant's guilt, the characteristic we found objectionable in *Percy.* It does not suggest, for example, that persons who abuse their children claim insanity. Thus, the testimony is neither "inflammatory" nor "prejudicial" nor does it go to "defendant's guilt by association with other defendants." *State v. Hicks,* 148 Vt. at 463, 535 A.2d at 778. It puts the defense into a perspective based on social science research rather than suggesting that the defense is in any sense inappropriate for this case or that the raising of the defense bears on defendant's guilt.

While the testimony was phrased in terms of statistical evidence, its real importance was to explain the nature of the sanity or insanity in the context of this case. Cf. Walker & Monahan, *Social Frameworks: A New Use of Social Science in Law*, 73 Va. L. Rev. 559, 568–71 (1987) (authors characterize such evidence as a "social framework" with some of the indicia of legislative facts). This makes the evidence similar to that offered in *State v. Percy*, 149 Vt. 623, 639–42, 548 A.2d 408, 417–19 (1988) (hereinafter *Percy II*). In *Percy II*, the State's psychiatric witness testified that the defendant was not insane but was an "anti-social personality" and supported this diagnosis by reciting defendant's history of criminal activity. We upheld the admission of the evidence because our precedents "established a very broad rule of admissibility of evidence bearing on sanity" and the witness was testifying about a recognized diagnosis with supporting evidence. *Id.* at 639–40, 548 A.2d at 417–18. Here, the witness was, in effect, explaining that abusive acts to children are not part of the elements or indicia of insanity. That testimony addresses that part of our insanity defense definition that excludes "abnormality manifested only by repeated criminal or otherwise anti-social conduct." See 13 V.S.A. § 4801(a)(2).

There is an additional concern about the evidence here, not present in *Catsam* and cases similar to it: whether the statistical evidence can be perceived as expert testimony about the probability that the defendant was guilty, or in this case not insane. See, e.g., Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv. L. Rev. 1329, 1334 (1971). This case falls in an area where there has been a great deal of recent academic comment. See, e.g., 1 Weinstein's Evidence ¶ 401[07], at 401–49 n.9 (1988); *Green Symposium*, 66 B.U.L. Rev. 377–80 (1986). We note, however, that there is no testimony here about the incidence of insanity among child abusers except the relative statement that it is no greater than for the population as a whole. The witness *did not* testify, for example, that most child abusers are sane or that child abusers are typically

sane.[4] Further, the evidence goes to rebut a defense rather than attempting to show defendant's guilt by statistical probabilities. Even those commentators who have been highly critical of statistical evidence have recognized the reduced dangers for this kind of rebuttal evidence. See Jaffee, *Of Probativity and Probability: Statistics, Scientific Evidence, and the Calculus of Chance at Trial*, 46 U. Pitt. L. Rev. 925, 1069, 1079–82 (1985).

■ For the above reasons, we find that the testimony of the District Director on the relationship between insanity and child abuse was not unduly prejudicial. Since it was relevant and was a proper subject matter for an expert witness, the trial court did not commit error in admitting it.

Defendant's second claim on appeal is that the trial court erred in denying her motion for judgment of acquittal at the close of the State's case. This claim is based on defendant's contention that the State failed to demonstrate a causal nexus between an affirmative unlawful act of defendant and the death of the infant. Absent such a showing, argues defendant, the State was unable to demonstrate the existence of a duty for her to provide medical care for the child. This argument mischaracterizes both the State's case and the applicable law.

As indicated above, defendant was charged in a two count information; the two counts were stated in the alternative. The jury was clearly instructed that the proof necessary to support a conviction under Count I was different than that necessary to support a conviction under Count II. Specifically, in order to find defendant guilty of manslaughter, under Count I, the jury had to find that defendant "being the natural mother and having custody, charge and care of Jordan Lee Valley ... and therefore having a duty to care for Jordan Lee Valley, failed to obtain appropriate medical care and treatment for said child, which conduct involved a high degree of risk of death or serious bodily injury to Jordan Lee Valley, and as a result thereof, that conduct, ... unlawfully cause[d] the death of Jordan Lee Valley." Whereas, to come to a guilty verdict under Count II, the jury

---

[4] While the witness used percentages, it was only to explain the concept. He did not testify that 90% of child abusers are sane.

needed to find, among other things, that the defendant "willfully ill-treat[ed] and neglect[ed] [the] child in a manner to cause the child unnecessary suffering and endanger her health."

The trial court charged the jury that the first count of the information "consist[ed] of three essential elements": (1) "the omission of the duty required by law"; (2) "that the omission was done recklessly and wantonly"; and (3) "that the omission caused the death of [Jordan Lee Valley]." It was not necessary for the jury to find that defendant had actually physically abused Jordan in order to find her guilty of manslaughter as charged in the information. Rather, the charge was based exclusively on a parent's affirmative duty to provide medical care to his or her child when such care is necessary and within the means and capacity of the parent. Essentially, defendant disputes that the law imposes any such duty.

■■ There is no question that while "liability for involuntary manslaughter is usually based upon the performance of an 'act[,]' . . . it may also be based upon an 'omission.'" 2 Wharton's Criminal Law § 172, at 282–83 (14th ed. 1979); see 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.3, at 282 (1986). Such an omission is a "failure to act when there is a 'legal' duty to act." 2 Wharton's Criminal Law § 172, at 283 (footnote omitted); see *State v. Noakes*, 70 Vt. 247, 262, 40 A. 249, 254 (1897). In *Noakes* this Court stressed that the failure to fulfill a legal duty, which one has the "capacity, means and ability to perform," may result in criminal liability should such failure cause the death of one to whom the duty is owed. *Id.* at 262, 40 A. at 254. The duty upon which Count I is based is a parent's duty to obtain necessary medical care for his or her minor child. While we have not had occasion to discuss that duty in the past, it is well established in the law. See *Robey v. State*, 54 Md. App. 60, 77, 456 A.2d 953, 961–62 (1983) ("The law requires parents to obtain necessary medical care for their minor children. This is an independent duty, gross neglect of which subjects the parent to criminal sanction.") (citations omitted); *State v. Hoffman*, 196 Mont. 268, 639 P.2d 507 (1982) (court upheld defendant's convic-

tion for negligent homicide based on defendant's failure to secure necessary medical treatment for three-year-old son).

■ The duty of a parent to provide necessary care and treatment for his or her minor children stems from the status of parent and child, and thus, it is not dependent on whether the parent caused the injury precipitating the need for treatment. See *Albright v. State*, 58 Ala. App. 480, —, 280 So. 2d 186, 190, *cert. denied*, 291 Ala. 771, 280 So. 2d 191 (1973). In *Albright*, the Alabama Court of Criminal Appeals observed that:

> The law of neglect or omission as the same relates to infant children comes to us from the ancient common law being grounded upon a status relationship of paternal support, care, protection and nurture. An obligation imposed by law carries with it the corresponding legal duty to meet and discharge the responsibility. Willfully allowing one to be exposed to conditions which will probably result in death, where there is a duty to protect such person, constitutes murder.

*Id.* at —, 280 So. 2d at 190.

This case is very similar to *Hoffman*, wherein the Supreme Court of Montana determined that there was sufficient evidence to support a mother's conviction for negligent homicide due to her failure to provide medical attention for her small child. In that case, the mother left her three-year-old son in the care of another for a period of time during which the child sustained a number of serious injuries. When the mother next saw the child, he was severely bruised, vomiting, had been bleeding from the nose and mouth, exhibited distension of the stomach, was pale in complexion, and had dilated pupils. The court held that because she disregarded the seriousness of the injuries and the "obvious need for medical care," defendant was properly subject to criminal liability and sanction for the child's death.[5]

---

[5] Evidence necessary to establish the requisite omission on defendant's part, sufficient to support the manslaughter conviction, included the overall poor physical condition of the infant, along with defendant's knowledge of such condition, as well as the fact that defendant fed the child twice on the day of

■ Here, as in *Hoffman*, the State's case for involuntary manslaughter was not dependent on a showing that defendant caused the life-threatening situation. Rather, the State's burden of proof was discharged on a showing that defendant was the natural mother of Jordan Lee Valley, that circumstances indicated a need for medical treatment for the welfare of the infant, that defendant had the means and capacity to secure such attention, and finally, that defendant failed in providing the necessary medical care. See *State v. Noakes*, 70 Vt. at 262, 40 A. at 254. Since the record indicates that the State satisfied its burden, defendant's motion for judgment of acquittal was properly denied. See also 2 LaFave § 7.12, at 281 (an omission to "furnish medical care for helpless, sick or injured persons to whom the defendant owes a duty of care" may be grounds for a conviction of manslaughter) (citing *Craig v. State*, 220 Md. 590, 155 A.2d 684 (1959)) (parents, relying on prayer, omitted to call doctors and child died; parents convicted of manslaughter; *held*, conviction reversed and remanded for new trial on proximate cause; but if parents' omission to act showed wanton and reckless disregard for child's life, failure would constitute proximate cause of death, so as to constitute manslaughter).

Defendant's third argument is that the trial court committed error by precluding defendant from calling evidence in her favor in violation of Chapter I, Article 10 of the Vermont Constitution and the Sixth Amendment to the United States Constitution. This claim is based on rulings by the court with regard to the testimony of two witnesses—Stacey Bartlett, defendant's mother, and Sergeant John Vining, an investigative officer who arrived at defendant's home on the day of the infant's death.

■ Defendant first claims that the court improperly insulated Stacey Bartlett from questions about her role in the physical abuse of, and feeding of liquor to, Jordan Lee Valley. The defense purpose was to demonstrate that she, not defendant, was responsible for the injuries that contributed to Jordan's

---

its death—at approximately 7:00 a.m. and 11:30 a.m.—with the child vomiting following each feeding.

death and necessitated the medical care that was not provided. This argument must fail because defendant's conviction on Count I is based on her failure to provide medical care, regardless of the cause of the harm. It is no defense to the charge that someone else caused the need for medical care. Thus, even if there was error in the ruling excluding Stacey Bartlett's testimony, which we do not decide, it was harmless. See, e.g., *State v. Nash*, 144 Vt. 427, 434, 479 A.2d 757, 761 (1984) ("'[I]t is the *duty* of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, *including most constitutional violations.*'") (quoting *United States v. Hasting*, 461 U.S. 499, 508–09 (1983)) (emphasis in original).

In regard to the testimony of Sergeant Vining, defendant claims prejudice in the court's refusal to permit her to effectively reopen cross-examination of this witness five days after he had testified, for the purpose of exploring issues raised during direct and cross-examination of the witness on the first day of trial. Under V.R.E. 611(a), the trial court must "exercise reasonable control over the mode and order of interrogating witnesses" so that the testimonial presentation is "orderly and effective for the ascertainment of the truth." In order for this Court to find error in the trial court's ruling in this area, there must be a showing of abuse of this discretion. We find no abuse in this case. Officer Vining had been examined and cross-examined about his observations of the mental state of the defendant at the time of arrest. In this case, the trial court could properly deny defendant's counsel the opportunity to reopen the line of inquiry where there was no reason that the questioning could not be completed fully during the initial cross-examination. This was a very long and difficult trial (12 days) that demanded evidentiary management action by the trial judge. We will not second guess those actions.

Defendant's next two contentions deal with the doctor-patient privilege and the use of certain psychiatric testimony. First, defendant alleges it was error to allow the State to elicit testimony from two psychiatrists and a mental health social worker who treated defendant at the Vermont State Hospital for depression following the death of her child. Second, defend-

ant alleges it was error to allow the State to elicit from its expert psychiatric witness testimony about statements made by defendant that bear on defendant's guilt.

Vermont has an evidentiary privilege protecting confidential communications between doctor and patient made for the purpose of diagnosis or treatment of the patient's mental or emotional condition. V.R.E. 503(b) (based on 12 V.S.A. § 1612). Defendant alleges that the information provided to the state hospital doctors and social worker came within the privilege and cannot be used by the State as part of its proof that defendant was sane at the time of the crime.

Defendant overlooks the fact that there is an exception to the privilege for "a communication relevant to an issue of the physical, mental, or emotional condition of the patient in any proceeding in which [any party] relies upon the condition as an element of his claim of defense . . . ." V.R.E. 503(d)(3). In this case, defendant put her sanity in issue by filing the notice required by V.R.Cr.P. 12.1. Even though the burden of proof on sanity remained with the prosecution after the notice was given, see *State v. Gokey,* 136 Vt. 33, 37, 383 A.2d 601, 603 (1978), we hold that the exception applies in a case like this where the evidence goes to the sanity of the defendant.

The exception contained in V.R.E. 503(d)(3) is intended to "carr[y] forward the Court's interpretation of 12 V.S.A. § 1612 in *Mattison v. Poulen,* 134 Vt. 158, 163, 353 A.2d 327 (1976), that the privilege is waived by the commencement of the action not only as to the actual condition in suit but as to 'matters causally or historically related' to that condition." Reporter's Notes to V.R.E. 503. *Mattison* involved a negligence action where the plaintiff claimed injury caused by defendant's actions. The Court held that "by bringing an action for damages arising from the injuries the plaintiff claims to have suffered, the [physician-patient] privilege is waived." 134 Vt. at 161, 353 A.2d at 330. The Court quoted from C. McCormick, Law of Evidence § 103, at 222 (E. Cleary 2d ed. 1972):

> [The privilege] is justified to encourage frankness in consulting physicians. But it is neither human, natural, nor understandable to claim protection from exposure by

asserting a privilege for communications to doctors, at the very same time when the patient is parading before the public the mental or physical condition as to which he consulted the doctor . . . . This in the oft-repeated phrase is to make the privilege not a shield only, but a sword.

The reasoning of *Mattison* was followed by this Court in a case directly on point. See *State v. Mecier*, 138 Vt. 149, 154–55, 412 A.2d 291, 295 (1980). In *Mecier*, the defendant relied on an insanity plea. This Court allowed the State to cross-examine defendant's psychiatrist as to "the factual basis for the psychiatrist's opinion." The Court held that "[t]his cross-examination was a proper method of impeaching a psychiatrist's testimony. There was no violation of the physician-patient privilege." *Id.* at 155, 412 A.2d at 295.

█   We find no error in allowing the State to elicit testimony from defendant's treating psychiatrists and social worker once defendant put insanity in issue. We are not willing to allow the defendant to use the patient's privilege as both a sword and a shield to ensure that the court has only an incomplete and one-sided version of her mental health condition. The evidence here was covered by V.R.E. 503(d)(3) and was admissible.

Defendant's second doctor-patient privilege contention is also without merit. In it, defendant alleges that the State went beyond the liberty given it by V.R.E. 503(d)(3) by eliciting testimony about a conversation defendant had with a psychiatrist that bore on whether defendant committed the crime for which she was charged. Defendant is correct that the exception of V.R.E. 503(d)(3) does not protect such testimony. It prohibits the use of the exception to the privilege in instances where "the state seeks to admit information obtained in the examination of the mental or emotional condition of a patient in a criminal case for the purpose of proving the commission of a criminal offense or for the purpose of impeaching the testimony of the patient." *Id.* This proviso is based on this Court's decisions in *State v. Hohman*, 136 Vt. 341, 392 A.2d 935 (1978), and *State v. Lapham*, 135 Vt. 393, 377 A.2d 249 (1977). See also Reporter's Notes to V.R.E. 503.

In *Hohman* and *Lapham,* the State cross-examined defendant's psychiatric expert witness on statements by the defendant to the expert that established elements of the crime. In *Lapham,* the evidence went to premeditation and malice. 135 Vt. at 404, 377 A.2d at 255–56. In *Hohman,* the evidence described "in gruesome detail the defendant's actions and mental processes as he strangled his victim and disposed of her body." 136 Vt. at 345, 392 A.2d at 938. Both *Lapham* and *Hohman* involve instances where the evidence was offered to show that defendant committed the crime. In *State v. Mecier, supra,* this Court distinguished *Lapham* and *Hohman* as follows:

> [In *Hohman* and *Lapham*] the evidence bore directly on the essential elements of premeditation and malice. In the case at bar, the evidence did not directly bear on such essential elements of the crime alleged. The cross-examination here reached only the factual basis for the psychiatrist's opinion . . . . In order to attack the credibility of the doctor's opinion, the State elicited the factual basis of it and attempted to prove its inaccuracy. This cross-examination was a proper method of impeaching a psychiatrist's testimony. There was no violation of the physician-patient privilege.

138 Vt. at 155, 412 A.2d at 295 (citation omitted). The codification of this line of cases in V.R.E. 503(d)(3) reflects this essential difference. Thus, the testimony falls within the privilege only if offered for the "purpose of proving the commission of a criminal offense or for the purpose of impeaching the testimony of the patient." V.R.E. 503(d)(3).

This case is closer to *Mecier* than to *Lapham* or *Hohman.* The State examined its expert witnesses to show the basis for the witnesses' conclusions that defendant was sane. Where the State did elicit statements from the defendant to the psychiatrist, the purpose was to prove the factual basis of his opinion, not to prove "the commission of a criminal offense." Once defendant elected to rely on expert opinion, the State was entitled to elicit statements made to the psychiatrists which cast doubt as to the conclusion that she was insane.

■ There are other reasons why there is no error in this case. During its examination of its psychiatric expert, the State elicited numerous statements made by defendant to the expert. Some of these related to the underlying crime, specifically the failure to obtain appropriate medical care. No objection was made to this testimony. Following the direct examination, *defendant's* counsel inquired in detail about the statements made by defendant to the psychiatrist. Some of these statements went to the underlying crime. When the State continued this line of examination, the defense counsel expressed "concern" but never formally objected. Where an objection is absent, untimely, or nonspecific, the error, if any, is waived. V.R.E. 103(a); *State v. Bissonette,* 145 Vt. 381, 392, 488 A.2d 1231, 1237 (1985) (defendant's objection did not state the specific ground for objection nor was it apparent from the context, and was therefore waived); *Reagan v. Brock,* 628 F.2d 721 (1st Cir. 1980) (although agreeing that testimony objected to was hearsay, circuit court sustained ruling below on grounds that plaintiff's objection, made after the question was answered, came too late, where plaintiff's counsel had remained silent when favorable hearsay answers were given); 1 Weinstein's Evidence ¶ 103[02], at 103–15 ("An attorney can also waive his client's right to raise an error on appeal by deliberately eliciting or relying on inadmissible evidence." (footnotes omitted)).

We recognize that cases may exist where evidence offered for the purpose of showing the basis of an expert opinion may be misused by the jury. In *Percy II* this Court noted a similar danger in using testimony about prior criminal acts as part of the basis of an expert opinion: "[T]he reasons [behind] admission can be abused by [parading] a litany of criminal acts having little to do with mental capacity or expert opinion or where there is no showing 'that the evidence bears some articulable relation to the issue.'" 149 Vt. at 641, 548 A.2d at 419 (citations omitted). In *Percy II* we suggested a careful balancing by the trial judge to ensure that probative value is not outweighed by prejudicial effect. *Id.* See V.R.E. 403. A similar balancing would have been warranted in this case had the defendant made a timely objection and drawn the need for balancing to the atten-

tion of the trial judge. The absence of a timely objection precludes review of the danger of misuse in this case. *State v. Neale,* 145 Vt. 423, 430, 491 A.2d 1025, 1030 (1985); see also *Reagan,* 628 F.2d at 723–24; Weinstein's Evidence, at 103–17 (an objection must be timely or it is waived).

■ Appellant's last two contentions relate to the trial court's instructions. First, defendant alleges that the instructions on involuntary manslaughter were confusing and misleading because they conveyed the impression that the jury could convict the defendant based solely on defendant's negligence as determined by the standard of care used in civil cases. While defendant has broadly argued this issue here, the objection after the charge was specifically that the charge presented "reckless and wanton conduct" and "careless and negligent conduct" as alternative theories of guilt. On appeal, defendant is bound by the specifics of her objection. V.R.Cr.P. 30.

■ There is no question that the trial court instructed the jury in this case that the State had the burden to prove that defendant acted "recklessly and wantonly" and reinforced that requirement. The defendant has selected some parts of the instruction out of context to suggest that the court at some points stated that ordinary negligence would be sufficient to convict. We must look at the charge as a whole rather than piecemeal. *State v. Norton,* 147 Vt. 223, 235, 514 A.2d 1053, 1061 (1986). If as a whole the charge "breathes the true spirit and doctrine of the law" and there is no fair ground to say the jury has been misled, there is no error. *Id.* We think that the charge in this case meets that standard. When we look at the charge as a whole, we do not believe that the jury could have interpreted it to say that ordinary negligence was sufficient to convict.

Appellant's second jury charge argument is that it was reversible error for the trial judge to charge the jury:

> Under the common law of the State of Vermont the natural mother of a child, having custody, charge and care of that child has a duty to obtain appropriate medical treatment for the child when the child suffers from illness or injury or both. Where a person has such a duty of care and recklessly and wantonly fails to get appropriate medical

treatment, and where that conduct results in the death of the child, the person is guilty of involuntary manslaughter.

As discussed above, the charge correctly stated the law on duty of a parent to a child. Without directly contesting that law, defendant suggests that the presence of a duty is a question of fact for the jury. We agree with the trial court's instruction that the application of the law to the facts of this case required the jury to determine whether the elements giving rise to the duty were present here. Once the jury found the critical facts, the duty was present as a matter of law; the jury does not decide the question of legal policy. There is no error in the charge.

*Affirmed.*

**Mahady, J.,** dissenting. I respectfully dissent. In this lengthy trial of an eighteen-year-old woman charged with manslaughter and child abuse in the death of her infant daughter, defendant's only defense was insanity. The trial court, over objection, permitted an expert witness to testify that the incidence of insanity among child abusers is no higher than in the general population. The majority holds that this testimony was properly admitted. I disagree, and would hold the admission of such testimony to be reversible error.

Evidence is inadmissible if it is irrelevant, V.R.E. 402, or, even if relevant, if its probative value is substantially outweighed by the danger of unfair prejudice, V.R.E. 403. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." V.R.E. 401.

In order to support its claim that Janet Valley was sane at the time of the alleged offenses, the State, over objection, introduced evidence by Conrad Grims, District Director of Social and Rehabilitation Services for the Newport area, that child abusers typically present certain characteristics; in particular, they are no more prone to mental illness than are members of the general population:

> The findings are that the incidence of mental illness is no greater among child abusers than it is in the general popu-

lation. That means that if, for example, ten percent of the general population is found to be mentally ill, we would expect that ten percent of child abusers would also be found to be mentally ill.[1]

I believe this testimony to be irrelevant to the determination of Janet Valley's sanity.

I am, first of all, deeply skeptical of the validity of the statistic. Mr. Grims refers to "findings," but nowhere describes where they are documented, who made them, or of what the studies consisted. We have recently stated that "[i]n order for this testimony [profile evidence] to be admissible, the condition must be one that is generally recognized in the field." *State v. Percy,* 146 Vt. 475, 483, 507 A.2d 955, 960 (1986). That the "condition" of being a child abuser is "generally recognized" has not been established to my satisfaction—by this record at least. Other courts have excluded evidence of a "battering parent" syndrome. *State v. Loebach,* 310 N.W.2d 58, 64 (Minn. 1981) (exclusion "required until further evidence of the scientific accuracy and reliability of syndrome or profile diagnoses can be established"). Cf. *State v. Catsam,* 148 Vt. 366, 369–70, 534 A.2d 184, 187 (1987) (profile evidence of sexually abused children admissible under V.R.E. 702 in appropriate circumstances).

Even if the generalization were accurate, however, it can have no bearing on whether Janet Valley is among the ten percent who are mentally ill or the ninety percent who are not. And *that* is the "fact that is of consequence to the determination of the action." V.R.E. 401. In *State v. Percy,* a case similarly involving the State's introduction of evidence—that rapists typically claim consent or amnesia—to rebut defendant's insanity defense, we wrote: "We fail to see how explanations or excuses offered by other rapists are relevant to what this particular defendant said in response to the offense charged." 146 Vt. at 484, 507 A.2d at 960. I similarly fail to see how a claim about the incidence of mental illness among child abusers is relevant to

---

[1] This testimony was emphasized by the State in its closing argument to the jury:

It may seem startling, but the evidence is that even in serious cases of child abuse serious mental illness is not any more present there than it is in the general population. Most child abusers are not legally insane, we submit.

whether Janet Valley was mentally ill. In *Percy*, the State's evidence "did not provide jurors with an explanation as to why most rapists made these claims. It simply casts doubt on the defendant's credibility by suggesting to the jury that all persons charged with rape made these same assertions." *Id.* at 483, 507 A.2d at 960. In the case at bar, the disputed evidence likewise simply casts doubt on Janet Valley's insanity defense by suggesting that she is not likely to be insane because child abusers generally are not likely to be insane. See *Duley v. State*, 56 Md. App. 275, 281, 467 A.2d 776, 780 (1983) (admission of "child battering profile" was error; "evidence is totally irrelevant because it does not tend to prove that [defendant] committed the acts of abuse attributed to him"); *State v. Petrich*, 101 Wash. 2d 566, 576, 683 P.2d 173, 180 (1984) (improper to admit expert testimony that in "eighty-five to ninety percent of our cases, the child is molested by someone they already know"); *State v. Maule*, 35 Wash. App. 287, 293, 667 P.2d 96, 99 (1983) (reversible error for trial court to admit evidence that accused was member of group which had higher incidence of committing sexual abuse of children than other groups).

The majority cites *State v. Catsam* as determinative on the question of the relevance of the disputed evidence. *State v. Valley*, 153 Vt. 380, 386, 571 A.2d 579, 582 (1989). I do not read *Catsam* so expansively. In *Catsam*, we stated in dicta that the trial court may in appropriate circumstances admit evidence on "the psychological and emotional profile" of child victims of sexual assault. 148 Vt. at 370, 534 A.2d at 187;[2] see also *State v. Hicks*, 148 Vt. 459, 462, 535 A.2d 776, 777 (1987). This conclusion must, however, be read in context:

> Given the demonstrated usefulness that such evidence can have in assisting the jury to assess the credibility of the complaining child witness, we join the majority of courts that have concluded that it is within the trial court's discretion to admit such evidence in appropriate circumstances.

---

[2] This portion of the opinion was dicta because the defendant had not challenged the "profile evidence," *id.* at 368–69, 534 A.2d at 186; the issue was the admission of expert testimony on the credibility of the complaining witness, and it was on that issue that we reversed.

*Catsam,* 148 Vt. at 369–70, 534 A.2d at 187. Furthermore:

> The *unique psychological effects of sexual assault on children* place the average juror at a disadvantage in understanding the behavior of the victim. The confusion, shame, guilt, and fear that often result from such abuse may cause a "victim to react and behave in a different manner from many other crime victims, especially when the sexual abuse victim is forced to testify to the acts in open court."

*Id.* at 369, 534 A.2d at 187 (quoting *Commonwealth v. Baldwin,* 348 Pa. Super. 368, 377, 502 A.2d 253, 258 (1985)) (other citations omitted) (emphasis added).

In *Catsam,* the evidence pertained to the victim, a child. Here, the evidence pertains to the defendant, an adult. These distinctions are critical. It was only because of the "unique psychological effects of sexual assault on children" and the "demonstrated usefulness" of evidence on their emotional symptoms that we reached the conclusion we did. Any support in *Catsam* for the majority's holding today, therefore, is extremely tenuous.

Even if the disputed testimony were relevant—perhaps, as the State contends, to counter a "common misperception of the general public that any parent who would commit such abuse . . . must be mentally ill"—it should have been excluded under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice.

There is a distinct worry that the jury will improperly infer from the challenged testimony alone that Janet Valley is among the ninety percent alleged to be sane. This Court has previously expressed concern that expert testimony on rape trauma syndrome "lent an improper 'aura of special reliability and trustworthiness' to the complainant's testimony." *State v. Bubar,* 146 Vt. 398, 401, 505 A.2d 1197, 1199 (1985) (quoting *State v. Saldana,* 324 N.W.2d 227, 230 (Minn. 1982)). Here, the concern is the opposite: that the "aura of special reliability and trustworthiness" surrounding the expert will unfairly prejudice Ms. Valley's ability to present her defense and will hinder rather than assist the trier of fact in understanding the evidence. Again, our decision in *State v. Percy* is pertinent:

The testimony stereotyped the defendant as one whose explanations were not to be believed because they were explanations typically offered by psychiatric patients accused of rape. The resulting prejudice is obvious. The jury could well have concluded that this rapist was just like all the other rapists and rejected the defendant's insanity defense not because of the evidence before it but because "he fit the mold."

146 Vt. at 484, 507 A.2d at 961.

The majority states that "the evidence does not go directly to defendant's guilt, the characteristic we found objectionable in *Percy*." *Valley*, 153 Vt. at 387, 571 A.2d at 583. The issue at trial was not whether defendant did or did not do any particular acts; the issue was whether she was sane at the time, that is, whether she had the requisite mental state to establish guilt. The disputed testimony did go directly and precisely to that issue: Janet Valley was a child abuser and child abusers are typically sane. In the context of the issues before the jury, this testimony was the equivalent of testimony that rapists typically claim consent or amnesia—the forbidden evidence in *State v. Percy*, 146 Vt. at 483, 507 A.2d at 960. The testimony was "inflammatory and prejudicial and went directly to the question of defendant's guilt by association with other defendants." *State v. Hicks*, 148 Vt. at 463, 535 A.2d at 778 (explaining the prejudicial effect of the testimony at issue in *Percy*).

The admission of the testimony by Mr. Grims on the incidence of mental illness among child abusers was therefore error. Since there is a reasonable possibility that the error contributed to the jury's verdict that Janet Valley was sane, it cannot be deemed harmless under V.R.Cr.P. 52(a).

Several psychiatrists testified on both sides on the issue of insanity. The closing arguments focused almost exclusively on this issue. The issue appears to be a close one. We cannot say, therefore, that the jury would have reached the same result absent the disputed evidence. "Harmless error analysis requires the reviewing court to inquire if, absent the alleged error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error." *State v.*

Catsam, 148 Vt. at 371, 534 A.2d at 188 (quoting *State v. Hamlin*, 146 Vt. 97, 106, 499 A.2d 45, 52 (1985)). "Since the defendant holds a carefully guarded right to have his guilt adjudged by the jury, an appellate court should be slow to assume that an error in the trial was inconsequential." *De Luna v. United States*, 308 F.2d 140, 155 (5th Cir. 1962).

I would be "slow to assume" that any error here was inconsequential and would hold that the State has failed to establish that the trial court's admission of the challenged testimony was harmless.[3] The testimony went to the central issue of the trial: whether Ms. Valley was legally insane at the time of the alleged offenses. We do not know how the jury would have decided without the challenged testimony, and we should not take the issue out of its hands. "[I]t is not the appellate court function to determine guilt or innocence." *Kotteakos v. United States*, 328 U.S. 750, 763 (1946).

Accordingly, I would reverse and remand for a new trial.

---

[3] The burden is on the party not prejudiced by the error to show that it was harmless. *Chapman v. California*, 386 U.S. 18, 24 (1967); *State v. Catsam*, 148 Vt. at 372, 534 A.2d at 188.